UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff<br><br>vs.<br><br>TINA SULLY,<br>    Defendant | 4:22-cr-40013<br><br>MEMORANDUM OPINION<br>AND ORDER |

Pending before the Court is Defendant's motion for a new trial based upon newly discovered evidence. (Doc. 245). The Government resists the motion. (Doc. 258). For the following reasons, the Court grants the motion in part and denies it in part.

An additional matter is ripe for resolution. The Government filed a motion for revocation of presentence release, requesting that Defendant be taken into custody immediately. (Doc. 239). The Defendant responded, (Doc. 242), and the Government replied, (Doc. 244).

# BACKGROUND

Information pertinent to resolution of Defendant's motion for a new trial is summarized as follows:

1

The second superseding ten-count indictment alleged Defendant had abused three children, C.S., D.A.S. a/k/a D.F.H. (hereinafter D.F.H. in accordance with his stated preference), and G.S. III, while they were in her care at different times from 1998 to 2022. (Doc. 33). The indictment alleged two counts of assault with a dangerous weapon and one count of felony child abuse of C.S.; four counts of assault with a dangerous weapon and one count of felony child abuse of D.F.H.; and one count of assault with a dangerous weapon and one count of sexual contact with a minor involving G.S. III. The alleged offenses involving each child did not overlap with those of another child.

The case was tried to a jury during August 22-25, 2023; the court declared a mistrial when the jury was unable to reach a verdict. (Doc. 160). This Court conducted a second trial during September 9-12, 2023. The verdict was guilty on all counts. (Doc. 237).

The charges involving C.S., Counts 1-3, were alleged to have occurred between November 26, 2017, and May 23, 2022, ending on the latter date when 12-year-old C.S. appeared at a neighbor's house alleging abuse by the Defendant. The child was admitted to Wagner Community Memorial Hospital and the case was subsequently investigated by the Yankton Sioux Tribe Police Department and Child Protective Services. The child was interviewed by a forensic interviewer at Child's Voice, a medical child advocacy center.

At trial, C.S. was accompanied by an adult support assistant and testified at length about abuse inflicted by the Defendant. She described being hit with a belt, hangar, and plastic tubing by Defendant, who also stomped on her back, pulled her hair, and squeezed her neck to choke her. She testified that food was withheld from her. She stated she wanted to attend school but was told she couldn't because she would lie and steal from the teachers. She described being told no one loved her or ever would. She said she loves the Defendant. She was cross-examined and admitted to being in trouble at the foster placement where she resides, physical fights with her siblings, and wanting to go home. She stated she sometimes had accidents that required her to wear pull-up underwear.

The neighbor who found C.S. at her property testified about discovering C.S. and repeated some of the statements the child made at the time. The certified nurse practitioner who treated C.S. testified and described some of the injuries alleged to have been inflicted by Defendant. The Child's Voice forensic interviewer testified about the protocol used to conduct interviews, and a tape of her interview with C.S. was played. An investigator from the Yankton Sioux Tribe Police Department who had been called to respond to the scene testified and laid the foundation for admission of photographs depicting injuries to C.S.'s thigh, torso, back, neck, breast, bicep, crown of the head, and buttocks. The investigator's bodycam video with audio depicted an interview between an investigator and C.S. to determine

what had occurred, with what instruments, and who the perpetrator was. During the interview, the child provided information about why she was wearing pull-ups instead of underpants, as well as information about why she did not attend school.

A pediatrician from Child's Voice and Sanford Health testified about physical and psychological aspects of child abuse, including how children might disclose abuse, family dynamics, and long-term effects. She described her examination of C.S. which revealed many physical and emotional injuries, and she related the child's account of these injuries. All witnesses were cross-examined by the defense. The jury had the opportunity to observe the testimony of the witnesses, as did the Court.

The charges involving D.F.H., Counts 4-8, were alleged to have occurred during September 23, 2003, through June 28, 2007. At the time of trial, D.F.H. was 24 years old, and testified about events that occurred when he was 4-8 years old and resided with Defendant and her husband, first as a foster child and then as their adopted son. He described that he was fearful in Defendant's house, and that she hit him with a belt, extension cord, flyswatter, and hand. He testified Defendant choked him and deprived him of food. He said he ran away more than once and eventually was removed from Defendant's home and placed in various institutions. He testified he does not know C.S. or G.S. III and that their time in Defendant's home did not coincide with his. On cross-examination, D.F.H.

4

testified about various placements once he left Defendant's home and the difficulty he experienced in those settings which led to misconduct on his part. He testified he thinks he was born with Fetal Alcohol Syndrome.

The charges involving G.S. III., Counts 9 and 10, were alleged to have occurred during April 1, 1993, to March 31, 1998. At the time of trial, G.S. III was 35 years old. He testified he wanted to forget what occurred when he was 5-6 years old and residing with Defendant and her husband, who are his aunt and uncle. He described the Defendant beating him with a belt and withholding food from him. He described that the Defendant once grabbed his penis and scolded him for suspected sexual behavior when he was six years old. From the scant evidence it appeared that this was discipline that was not a criminal offense. He described Defendant washing his mouth out with soap. He admitted he stole food when he was deprived of it. Later in life he was convicted of two felonies and ten shoplifting offenses. He said he was homeless and on drugs for periods of time.

The above paragraphs describe the substance of the testimony on the assault and abuse charges. The Parties stipulated to various matters, including that the offenses occurred in Indian Country and that the children and Defendant are Indians. An FBI agent provided background evidence on these issues, and also provided maps and diagrams of the Defendant's house and other aspects of the area's geography.

Following the Government's presentation of evidence, the Defendant moved for a judgment of acquittal under F.R. Crim. P. 29. The Court denied the motion with respect to Counts 1-9. The Court took the motion with respect to Count 10 under advisement, and informed the Parties it was a close question whether the evidence was sufficient for conviction.

The defense called four of the children who resided in the home with Defendant and her husband while C.S. lived there. All testified they were treated well in the home and did not observe any mistreatment of C.S. by Defendant. They described misbehavior by C.S. which resulted in appropriate punishment. One adopted son who is now an adult still residing in the house described C.S. as troubled, stubborn, and prone to acting out. He described Defendant as a great mother who took children in bad situations into her home. He stated he was only six years old when D.F.H. left the home, but that he remembered him as a bad kid. Another son who is now an adult still residing in the house described C.S. as having behavior problems and wanting to be around Defendant. He also described D.F.H. as having serious behavior problems that were worse than C.S.'s. The witnesses were cross-examined.

The defense called a pediatrician from Sanford Medical system who had treated C.S. when she was a patient at the hospital a decade earlier. She described that C.S. was underweight and had skin problems. The defense called a nurse

practitioner from the Indian Health Service who testified she had placed more than ten children in the Sully home, and that she never observed signs of abuse or had any complaints of abuse made to her. On cross-examination she stated she was not the caseworker for C.S. or for D.F.H. once he was adopted by the Sullys. The defense called Defendant's sister, who resided with Defendant and her husband for a period of time, and never saw any problem of abuse. She reported being 13 years old when she observed G.S. III engage in misconduct when he was 4-5 years old.

The defense called Defendant's husband as a witness. He described how Defendant and he had taken into their home approximately twenty foster children over a period of twenty years. He testified that none of the children had made any complaints of abuse and that he never witnessed any abuse or physical manifestations of abuse. He stated D.F.H. had engaged in such aggressive behavior that the other children were not safe, and as a result, Defendant and he had to cancel their adoption of him and return him to the authorities. He testified that G.S. III had lived in the home a short time, had been abused by his own father, and engaged in serious misbehavior. He offered his opinion that the allegations against Defendant were politically motivated and had affected his re-election to a tribal office.

To prove the seven charges of assault with a dangerous weapon against the Defendant, the Government was required to establish that the Defendant assaulted

7

the victim with the specific intent to cause bodily harm using a dangerous weapon, that the child was under the age of 18, that the Defendant is an Indian and that the assault took place in Indian Country. To prove the two charges of child abuse, the Government was required to prove that the Defendant, an Indian acting in Indian Country, abused, exposed, tortured, tormented, or cruelly punished the victim, who was under the age of 18. To prove the charge of abusive sexual contact, the Government was required to prove that the Defendant, an Indian acting in Indian country toward a child under the age of 12, knowingly engaged in or caused sexual contact with the child. See 18 U.S.C. §§ 113(a)(3), 113(c), 2244(a)(1), 2245(3), 3559(f), 1153; S.D.C.L. §§ 26-10-1, 26-8A-2.

The Court instructed on the ten charges in the superseding indictment. (Doc. 233). The Court also advised the Parties that although Count 10 would be submitted to the jury, the Court would give additional thought to whether the motion for acquittal should be granted. As noted, the jury returned a verdict of guilty on all charges.

## MOTION FOR NEW TRIAL

### 1. Factual Support

Defendant has moved for a new trial based on newly discovered evidence in the form of a tape recording of a telephone call between Defendant's daughter, Jersey Sully, and G.S.III, which occurred on August 6, 2023. Defense counsel was

informed of the existence of the tape recording on September 19, 2023, several days after the guilty verdict for the Defendant. Counsel received a copy the following day. Affidavits from Defense Counsel and the Defendant state they were unaware of the call or recording until after trial. (Doc. 245-1, 245-2).

Crucial to the motion is G.S. III's statement during the two calls that the Defendant "never did anything to me," repeated several times. (Audio recording 1 at 5:20). He explained his accusations against Defendant by stating he "blamed it" on her and wanted "to lash out at someone" who was his "protector." (Id. at 9:44). He also stated that blaming abuse on Defendant was his way of putting "the memories together." (Recording 2, at 2:03) (Doc. 246, PgID 2462; Doc. 256, PgID 2725; transcript of call unavailable). G.S. III also said, "your Mom helped me so much, she protected me" and "I do not know why I lied," both on recording 1.

At the trial before this Court, as noted previously, G.S. III testified that he wanted to forget what happened to him as a child. He also testified at trial that he had "buried" some memories of what had occurred during his childhood, and that he was "scared" now and did not want to be in trouble. It is particularly important that the Court took under advisement whether the evidence supporting Count 10 was sufficient for conviction.

In evaluating the defense motion, the Court has the benefit of a transcript of G.S. III's testimony at the first trial. (Doc. 204). In that proceeding, G.S. III

9

indicated he lived with Defendant and her husband when he was approximately 5-7 years old and that Defendant treated him "really good." (Doc. 204, PgID 1466). He described being hit with Defendant's hand or a belt; that he was alone in the house with her when it occurred; there were no marks, but "hurt feelings"; and he could not remember whether she touched his private parts but then did remember that she did and called him a "pervert." (Id., PgID 1467-71). He also stated he was nervous on the witness stand and was recounting things "from my past that I thought I would never talk about." He stated reluctance to discuss things that happened to him as a child and dismay that people on the reservation had stopped talking to him. (Id., PgID 1471-73). He stated the abuse at Defendant's house was less than at his father's house. (Id., PgID 1473). On cross-examination he admitted drinking alcohol and huffing at a young age, as well as being in numerous group homes where he engaged in serious misconduct. He stated he did not receive the kind of help he needed in such settings. (Id., PgID 1483).

## 2. Legal Standard— Motion for New Trial, F. R. Crim. P. 33

Rule 33 authorizes the district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The district court must "exercise the Rule 33 authority 'sparingly and with caution.'" *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002). The district court's goal is to determine "whether a new trial is necessary to prevent a miscarriage of justice."

*Manning v. Jones*, 875 F.3d 408, 410 (8th Cir. 2017). See also *United States v. Harriman*, 970 F.3d 1048, 1058 (8th Cir. 2020) (motion for new trial should be granted only where serious miscarriage of justice may have occurred). The Eighth Circuit has emphasized that new trials are "reserved for exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Stacks*, 821 F.3d 1038, 1045 (quoting *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015)). The grant of a new trial is reviewed for abuse of discretion. *United States v. Broeker*, 27 F.4th 1331, 1335 (8th Cir. 2022).

The Eighth Circuit has reinforced that a court considering a motion for a new trial should "weigh the evidence anew" and is "permitted to disbelieve witnesses." *United States v. De La Cruz Nava*, 80 F.4th 883, 889 (8th Cir. 2023). The court may grant a new trial despite the existence of substantial evidence to support the verdict. *Id.* (citing *Campos*, 306 F.3d at 579). The court is not required to view the evidence in the light most favorable to the government. *Id.* (citing *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). See also *Broeker*, 27 F.4th at 1337. However, the jury verdict must stand "unless the district court ultimately determines that a miscarriage of justice will occur." *Campos*, 306 F.3d at 579) (citing *United States v. Lacey*, 219 F.3d 779, 783 (8th Cir. 2000)).

As the Eighth Circuit recently reiterated, a motion for new trial based on newly discovered evidence may be granted "only if the evidence was not

discovered until after the trial; there was no lack of diligence by the movant; and the new evidence is material, more than merely cumulative or impeaching, and likely to produce an acquittal if a new trial is granted." *United States v. Glinn*, 965 F.3d 940, 942 (8th Cir. 2020) (quoting *United States v. Dogskin*, 265 F.3d 682, 685 (8th Cir. 2001)). The standard is "rigorous" because such motions are "disfavored." *United States v. Shumaker*, 866 F.3d 956, 961 (8th Cir. 2017) (quoting *Dogskin*, 265 F.3d at 685). See also *United States v. Lewis*, 976 F.3d 787, 794 (8th Cir. 2020) (same).

The case before the Court presents the problem of determining under what circumstances a recantation is newly discovered evidence warranting a new trial. In *United States v. Rouse*, the court stated that motions for a new trial based on the recantation of a material witness are "viewed with suspicion." 410 F.3d 1005, 1009 (8th Cir. 2005) (*Rouse II*). See also *Rouse v. United States*, 14 F.4th 795 (8th Cir. 2021) (*Rouse III*) (affirming denial of relief pursuant to 28 U.S.C. § 2255); *Feather v. United States*, 18 F.4th 982 (8th Cir. 2021) (same). Skepticism is in order if witnesses "have changed their minds" or "claim to have lied at the trial." *Rouse II*, 410 F.3d at 1009 (quoting *United States v. Grey Bear*, 116 F.3d 349, 350 (8th Cir. 1997)).

The *Rouse II* court explained how to deal with a recantation as follows: "When the claim of newly discovered evidence is based on a recantation, the

district court must first determine whether the recantation is credible. In this regard, 'the real question ... is not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it.'" *Id.* (quoting *Grey Bear*, 116 F.3d at 350). Review of "this credibility finding for clear error is extremely deferential." *Id.* If the recanted testimony "bears on a victim's credibility or directly on the defendant's guilt," a new trial is required "if it would probably produce an acquittal on retrial." *Dogskin*, 265 F.3d at 685.

### 3. Analysis

In assessing whether to grant a new trial, the Court first determines whether the evidence was discovered after trial and whether counsel was diligent in seeking it. *Glinn*, 965 F.3d at 942. In this case, Defense Counsel and Defendant aver that they were not aware of the taped phone call until after trial. (Doc. 245-1, 245-2). The Government expresses skepticism that the evidence was newly discovered, (Doc. 258, PgID 2746-47), but the Court has no basis to discredit the affidavit of the Defendant on this issue. The adult daughter who made the recording was not living in the Defendant's home. The Court specifically credits the affidavit of Counsel.

The Government also argues the evidence is not newly discovered, but simply newly available. *United States v. Bell*, 761 F.3d 900, 911 (8th Cir 2014).

The Court disagrees with that characterization. It appears the witness who made the recording acted of her own accord and determined when and whether to provide it to the defense. Despite the extensive investigation in this case, apparently neither party knew that she had made a tape of her conversation with G.S. III. This is not inaction by the defense. *Id.* at 912. Had the witness wanted to assist the Defendant, she would have made the tape available prior to trial.

As it is, the Court is faced with a piece of evidence probative of the Defendant's guilt that neither side discovered prior to trial. Furthermore, the evidence relates to the substance of the charges against Defendant that involved G.S. III, who was a young child at the time of the alleged abuse and the sole witness describing events of approximately 25-30 years prior. The Court finds the recording fits the definition of newly discovered evidence and no lack of diligence was involved in failing to discover it prior to trial.

In further applying the standard for whether to grant a new trial, the court must determine whether the newly discovered evidence is material, not merely cumulative or impeaching, and would result in an acquittal.

In the Court's view, the evidence supporting the allegations of abuse of C.S. recounted above was solid proof of Counts 1-3. The physical evidence, lay and expert testimony, and C.S.'s account met the standard of proof beyond a reasonable doubt. The tape of G.S. III's statements did not undercut the evidence of the

Defendant's treatment of C.S, and nothing about the newly discovered evidence would result in acquittal of Counts 1-3. Therefore, the motion for new trial with respect to Counts 1-3 is denied.

With respect to Counts 4-8 alleging abuse of D.F.H., the evidence adduced at trial was from D.F.H. himself, without corroborating evidence comparable to that for the charges involving C.S. It is likely the jury drew comparisons between the alleged abuse of C.S. and D.F.H., including the types of mistreatment and circumstances under which it occurred. It was particularly important that C.S. and D.F.H. did not know each other and had never communicated about the abuse. Very likely, the jury relied on the strength of the evidence involving C.S. in convicting Defendant of the charges involving D.F.H. The Court finds the newly discovered evidence consisting of G.S. III's statements did not undercut the evidence of the Defendant's treatment of D.F.H., and nothing about the newly discovered evidence would result in an acquittal of Counts 4-8. Therefore, the motion for new trial with respect to Counts 4-8 is denied.

With respect to Counts 9-10 alleging abuse and sexual abuse against G.S. III, the equation is different. G.S. III's statements in the phone call with Jersey Sully that the Defendant never did anything to him, that he turned the Sully home into a toxic place in his mind, and that the Defendant helped and protected him are of a different quality with respect to the Counts involving G.S. III. His statements

about fragments of memories of past abuse, blaming the Defendant, and admitting he lied also are of a different quality. G.S. III admitted in his testimony at trial that he had been abused in many placements over a lengthy period of time. His accounts of abuse in the two trials differed substantially in length and quality. His message to an FBI agent about withdrawing his allegations and the statements on the tape reveal serious questions about the reliability of his allegations. At this point the Court has at least four versions from G.S. III about his time at the Sully house 25-30 years ago. The Court recognizes that the strength of the evidence in Counts 1-3 may have spilled over to Counts 9-10. The Court finds that G.S. III's statements on the recording are material. The Court further finds that a jury faced with contradictory versions of events involving G.S. III, and without the strength of the evidence on Counts 1-3, probably would acquit Defendant of Counts 9 and 10.

The Court recognizes that newly discovered evidence that merely impeaches is insufficient as the basis for a new trial. *United States v. Chappell*, 990 F.3d 673, 677 (8th Cir. 2021). In this case, the new evidence does not merely impeach. G.S. III's several contradictory accounts make his testimony unreliable. Furthermore, this is a conviction that rested solely on his testimony. As Judge Colloton noted in *Chappell*, "it is possible that new evidence affecting a witness's credibility in a particular case could be so damaging to the prosecution that a new trial would be

required." *Id.* at 680 (Colloton, J., concurring) (citing *United States v. Wallach*, 935 F.2d 445, 458-59 (2d Cir. 1991), abrogated on other grounds by *Ciminelli v. United States,* 598 U.S. 306 (2023)). The situation hypothesized by Judge Colloton—as in the case before the Court—occurs when "the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." *Wallach*, 935 F.2d at 458 (quoting *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975)).

The Court reserved ruling on the Defendant's motion for acquittal of Count 10 pursuant to F. R. Crim. P. 29 at the close of the Government's case. The Court hereby rules on the motion and grants an acquittal of Count 10. The Court grants the motion for new trial on Count 9.

## PRETRIAL RELEASE ORDER

The Court has reconsidered the pretrial release order and finds that pursuant to 18 U.S.C. § 3143(a)(2), the Defendant is not entitled to pretrial release. The Defendant is ordered to self-surrender at 2:00 PM on November 15, 2023.

## CONCLUSION

A new trial may be granted only to avoid a miscarriage of justice. The Court must act with caution in granting a new trial which is reserved for exceptional cases. The case before the Court involved two trials in which the ten Counts alleged assault with various dangerous weapons, child abuse, and sexual contact

with a child. The charges spanned approximately thirty years, with three different children, two of whom are now adults. The evidence of abuse of the now-adult victims was far less than what was available for the Counts involving the child.

A lengthy recording of one of the adults stating he lied, in injunction with the lack of corroborating evidence and the need to base the conviction almost entirely on his testimony, creates the unusual situation when a new trial must be granted. Therefore, the Court has granted a new trial for Count 9 and grants the motion for acquittal with respect to Count 10.

The Defendant is ordered to self-surrender at 2:00 PM on November 15, 2023.

Accordingly, IT IS ORDERED that:

1. the motion for new trial on Counts 1-8 is denied;

2. the motion for new trial on Count 9 is granted;

3. the motion for acquittal on Count 10 is granted;

4. the Defendant will self-surrender at 2:00 PM on November 15, 2023.

Dated this 7th day of November, 2023.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK